## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ANTHONY EILAND,** | : | **CASE NO. 1:11-CV-1519** |
| | : | |
| **Plaintiff,** | : | **MAGISTRATE JUDGE** |
| | : | **VERNELIS K. ARMSTRONG** |
| **vs.** | : | |
| | : | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE,** | : | **AND ORDER** |
| | : | |
| **Defendant.** | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c) of Defendant's final determination denying his claim for Period of Disability and Disability Insurance Benefits (DIB) under Title II of the Act, 42 U. S. C. §§ 416 (i) and 423 and his claim for Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq.  On November 30, 2011, the parties to this action consented to have the undersigned Magistrate adjudicate all further proceedings and enter judgment in this case pursuant to 28 U.S.C. § 636 (c) and Fed.R.Civ.P. 73 (Docket No. 13).  Pending are the parties' briefs on the merits (Docket Nos. 16 & 19).  For the reasons that follow, the Magistrate Orders that the Commissioner's Decision be Affirmed.

1

## I. Procedural Background

On June 18, 2007, the Plaintiff, Anthony Eiland, filed his Title II application for Period of Disability and Disability Insurance Benefits alleging disability beginning on November 24, 2004 (Docket No. 10, pp.144-48, Tr. 139-43).[1] Also on June 18, 2007, Plaintiff filed his Title XVI Supplemental Security Income application (Docket No. 10, pp.141-43, Tr. 136-38). On September 14, 2007, Plaintiff's claim was initially denied. (Docket No. 10, pp. 90-96, Tr. 85-91). On November 30, 2007, Plaintiff's claim was denied upon reconsideration (Docket No. 10, pp. 98-109, Tr.93-104). On January 7, 2008, Plaintiff timely filed a request for a hearing (Docket No. 10, pp.105-107, Tr. 100-102).

On August 31, 2009 a hearing was held before Administrative Law Judge (ALJ) Edmund Round.  While no testimony was taken at that hearing, the ALJ ordered Plaintiff to undergo a consultative physical examination (Docket No. 10, pp.32-33, Tr. 27-28). Subsequently, on February 12, 2010, a hearing was held before ALJ Round with Plaintiff, represented by his attorney, and Vocational Expert Kevin Z. Yi, M.Ed., Certified Rehabilitation Counselor giving testimony (Docket No. 10, pp.34-62, Tr. 29-57).

On June 24, 2010 the ALJ issued a Notice of Decision-Unfavorable (Docket No. 10, pp.9-28, Tr. 4-23).  On July 13, 2010, Plaintiff requested review of the hearing decision (Docket No. 10, p. 29, Tr. 24).  On June 13, 2011, the Appeals Council declined review (Docket No. 10,

---

[1]  All references to the transcript in this Report and Recommendation (i.e., Tr. #) refer to Docket No. 10, with the "Tr." numbers in this Report referring to the numbers located at the lower right corner of the transcript pages.  The parallel page numbers associated with Docket No. 10 in the format "Docket No. 10, p. #" refer to the docket page numbering system where the page numbers appear at the top of the page.

pp. 6-8, Tr. 1-3). This left the ALJ's decision as the final decision of the Commissioner.[2]

On July 23, 2011, Plaintiff filed her Complaint with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) (Docket No. 1).

## II.  Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and  42 U.S.C. § 1383(c)(3).  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832-33 (6th Cir. 2006).

## III.  Factual Background

### A.  Plaintiff's History

Plaintiff, Anthony Eiland, was born on July 24, 1959. He was 45 years old as of the alleged disability onset date and 50 as of December 31, 2009,  his last insured date  (Docket No. 10, p. 40, Tr. 35). Plaintiff's formal education included completing high school and two years of college (Docket No. 10, p. 40, Tr. 35).  Plaintiff served in the military for two years and was discharged for mental issues related to acute schizophrenia.  (Docket No. 10, p. 41, Tr.36).   His past relevant work consisted of ten years as a housekeeper/hospital cleaner for the Veteran's Administration (VA), which was unskilled and performed at the heavy exertion level, until 2003, when he was put on retirement disability (Docket No. 10, pp. 41, 52, Tr. 36, 47).

### B.  Relevant Medical Evidence and Opinion

---

[2]   The Commissioner found that Plaintiff had not engaged in substantial gainful activity since the date of his alleged disability onset and that Plaintiff had severe impairments, but also determined that none of Plaintiff's impairments, individually or in combination, met or equaled the criteria of the Listings (Docket No. 10, pp.14-18, Tr. 9-13). The ALJ determined that Plaintiff was limited to a reduced range of light work (Docket No.10, p.18, Tr. 13), and that there were a significant number of jobs in the national economy that accommodated Plaintiff's residual functional capacity and vocational profile, and, on this basis determined that Plaintiff was not disabled (Docket No. 10, pp. 21-22, Tr. 16-17).

## 1.  General

Plaintiff has a long history of both physical and mental impairments. Diagnoses include: diabetes, hypertension, high cholesterol, bilateral carpal tunnel syndrome, left knee torn meniscus, right shoulder rotator cuff tear, coronary artery disease and gastritis (Docket No. 10, p. 1054, Tr. 1049). As a result of the combined impairments, Plaintiff received a 50% disability rating from the Veteran's Administration for his paranoid schizophrenia (Docket No. 10, p.1007, Tr. 1002).

## 2.  Medical Evidence: Physical

**February 12, 1997**,  lumbar **MRI** showed mild diffuse bulging of the L4-L5 with no foraminal narrowing or herniation, and complete sacralization (Docket No. 10, p.730, Tr. 725). Despite difficulties with chronic back pain, Plaintiff continued to work.

**Dr. Asthma Syed - Treating Physician**
**June 27, 2002**, Plaintiff was treated by Dr. Syed (Docket No. 10, pp.1287-88, Tr. 1282-1283). Dr. Syed also performed a RFC (Docket No. 10, pp. 1287-88, Tr. 1282-1283), concluding that Plaintiff should be limited to sitting for 2 hours at a time, 6 hours daily, standing 90 minutes at a time, 4 hours daily, and walking 1 hour at a time, 4 hours daily (Docket No. 10, p.1287,  Tr. 1282). He further limited Plaintiff to handling with his dominant hand 1 hour at a time, up to 4 hours daily (Docket No. 10, p.1287,  Tr. 1282).
**December 31, 2002**, Plaintiff went to Dr. Syed, who diagnosed him with a lumbar strain (Docket No. 10, p. 1313,  Tr. 1308). Dr. Syed stated that Plaintiff exhibited tenderness on palpation to the lower lumbar area and bilateral paraspinal area (Docket No. 10, p. 1313,  Tr. 1308). Dr. Syed reported a palpable spasm in the lumbar spine, resulting in decreased range of motion (Docket No. 10, p. 1313,  Tr. 1308).
**January 13, 2003**, Plaintiff went to Dr. Syed (Docket No. 10, pp. 1305-1306,  Tr. 1300-1301). Dr. Syed diagnosed him with a low back strain and reported that Plaintiff exhibited tenderness in the cervical spine and right cervical paraspinal area (Docket No. 10, p. 1306,  Tr. 1301). Dr. Syed also noted that Plaintiff had diminished cervical range of motion, as well as, diminished range of motion in the lumbar spine, secondary to pain (Docket No. 10, p. 1306 Tr. 1301).
**November 21, 2003**, Dr. Syed examined Plaintiff and noted his complaints of pain in his neck, lower back, both arms and both legs (Docket No. 10, p. 633, Tr. 628).  Despite Plaintiff's complaints, X-rays from 2002 and 2003 showed that Plaintiff's cervical and lumbar spine were normal (Docket No. 10, p. 633, Tr. 628). On examination, Dr. Syed found Plaintiff's gait was normal and that he could stand on his heels and toes (Docket No. 10, p. 633, Tr. 628).  Plaintiff's straight leg raising test was normal on both sides, and his neurological condition was intact (Docket No. 10, p. 633, Tr. 628). Dr. Syed opined that Plaintiff's pain was muscle related

(Docket No. 10, p. 633, Tr. 628).

**January 7, 2004**, Dr. Syed noted that Plaintiff continued to work full-time, although with some restrictions (Docket No. 10, p. 629, Tr. 624). On clinical examination Plaintiff remained unremarkable for neurological or acutely abnormal findings (Docket No. 10, pp. 629-30, Tr. 624-25).

**January 28, 2003**, Plaintiff underwent bilateral knee and lumbar x-rays (Docket No. 10, pp. 326-28, Tr.321-323). The left knee x-ray showed minimal ligamental calcification attached to the anterior aspect of the patella, while the lumbar x-ray showed narrowing of the spine at L5-S1 (Docket No. 10, pp. 326-28, Tr. 321-323).

**April 16, 2003, EMG** studies showed a right median neuropathy (carpal tunnel) at, or distal to, the wrist (Docket No. 10,  p. 275, Tr. 270).

**Dr. Peter Brooks, M.D. - Treating Physician**
**June 1, 2003**, Plaintiff saw orthopaedic specialist, Dr. Brooks, who performed knee surgery (Docket No. 10, p. 253, Tr. 248). Dr. Brooks performed an arthroscopy, and medial and lateral meniscectomy (Docket No. 10, p. 253, Tr. 248).

**Dr. Michael Walker, M.D. - Treating Orthopedic Physician**
**November 7, 2003, MRI** scan of Plaintiff's right shoulder (approximately one year before Plaintiff claimed was disabled) (Docket No. 10, p. 689, Tr. 684). The MRI showed tendinopathy of the distal supraspinatus and infraspinatus tendons with mild fraying/partial thickness under surface tear, and degenerative changes of the AC joint and hypertrophic changes of the undersurface of the acromion (Docket No. 10, p. 689, Tr. 684).  Dr. Walker reviewed the MRI scan and found positive impingement signs (pain when moving the shoulder) and some mild crepitus (crackling sound from bones rubbing together), but the range of shoulder motion was acceptable (Docket No. 10, p. 637, Tr. 632).

**March 11, 2004**, Plaintiff underwent MRI scans, which showed normal findings (Docket No. 10, pp. 532, 625, Tr. 527, 620).

**April, 2004**, Plaintiff continued to complain of pain (Docket No. 10, p. 625, Tr. 620).

**Dr. Thomas Anderson, M.D. - Treating Physician**
**July 19, 2004,** Plaintiff was evaluated by Dr. Anderson for his chronic right shoulder pain (Docket No. 10, p. 515, Tr. 510).  He reported tenderness on motion of the right shoulder, consistent with significant impingement or tendinitis ( Docket No. 10, p. 515, Tr.510). Dr. Anderson also observed that a recent MRI showed a partial tear in the rotator cuff (Docket No. 10, p. 515, Tr. 510). Based on these findings, Dr. Anderson recommended arthroscopic evaluation and arthoscopic acromioplasty (Docket No. 10, p. 515, Tr. 510).

**September, 2004,** following his knee, back and shoulder problems, Plaintiff stopped working and filed an application for Social Security Disability Insurance benefits (Docket No. 10, p. 138, Tr. 133). As part of evaluating his disability claim, Disability Determination Services, had two physicians independently review the record and complete separate reports.

**November 4, 2004,** Plaintiff was prescribed bilateral wrist braces (Docket No. 10, p. 335, Tr. 330).

### Dr. Robert Norris, M.D. - Evaluating Physician

**December 16, 2004,** Dr. Norris completed a physical RFC assessment (Docket No. 10, pp. 591-98, Tr. 586-593). Dr. Norris assessed that Plaintiff could lift 20 pounds occasionally and 25 pounds frequently (Docket No. 10, p. 592, Tr. 587).[3]  Dr. Norris reported that Plaintiff could sit, stand or walk for 6 hours in an 8-hour workday (Docket No. 10, p. 592, Tr. 587).  He also assessed Plaintiff as being limited to occasional reaching with his right upper extremity (Docket No. 10, p. 594, Tr. 589).

### Dr Thomas Anderson, M.D. - Treating Physician

**March 16, 2005**, Dr. Anderson  performed subacromial decompression arthroscopic surgery on Plaintiff's right shoulder (Docket No. 10, pp. 607, 700, Tr. 602, 695).
**May 3, 2005**, at a follow-up appointment, Plaintiff stated that he was doing "good" but his shoulder "locked up" at times, especially when he reached for objects (Docket No. 10, p. 699, Tr. 694).

### Mr. Darnell Allen - Treating Physical Therapist

**March 23, 2005**, Plaintiff saw Mr. Allen (Docket No. 10, pp. 607-609, Tr. 602-603), who reported that Plaintiff exhibited limited range of motion in all planes (Docket No. 10, p. 607, Tr. 602)., decreased range of motion in the right shoulder to 115 degrees on flexion, 50 degrees on external rotation and 35 degrees on internal rotation (Docket No. 10, p. 607, Tr. 602), and decreased range of motion in his left shoulder, 140/ on flexion, 78 degrees on external rotation and 40 degrees on internal rotation (Docket No. 10, p. 607, Tr. 602).[4]

**December 20, 2005**, after experiencing chest pains, Plaintiff sought cardiac treatment and attempted a treadmill test (Docket No. 10, pp. 809-12, Tr. 804-807).  Plaintiff underwent cardiac stress testing that revealed a small, mildly reversible defect of the mid-to-distal anterior wall, consistent with reversible ischemia  (Docket No. 10, p. 812, Tr. 807).  He reached 8.8 METs at a heart rate of 153, but soon developed chest pain and shortness of breath during the test, and had to stop (Docket No. 10, p. 811, Tr. 806).  His left ventricular ejection fraction was 54% with normal wall motion (Docket No. 10, p. 812, Tr. 807).

**February 28, 2006**, Plaintiff underwent a left heart catheterization (Docket No. 10, p. 805, Tr. 800), which showed Plaintiff had single vessel coronary artery disease (Docket No. 10, p. 806, Tr. 801), specifically, a 30% mid stenosis in the left anterior descending, mild disease and heightened OM1 levels with 60% proximal stenosis in the left circumflex and mild disease in the

---

[3]  This contradictory finding does not appear to have been corrected in the record.

[4]  Normal range of motion limits are 180 degrees flexion, 90 degrees external rotation and 70 degrees - 90 degrees  internal rotation. See: http://www.livestrong.com/article/46391-norm al-range-motion-shoulder/.

right coronary artery (Docket No. 10, pp. 805-806, Tr. 800-801).  Medical therapy was recommended (Docket No. 10, p. 806, Tr. 801). Plaintiff's cardiac specialist stated that Plaintiff had a "mild" heart condition (Docket No. 10, pp. 805-806, Tr. 800-801).

**March 15, 2007**, Plaintiff was diagnosed with new onset diabetes after his hemoglobin A1C was found to be 12.1 (Docket No. 10, p. 761, Tr. 756).[5]  Plaintiff's medications were adjusted and his glucose levels remained controlled on oral medication (Docket No. 10, p. 1337, Tr.1332).

**Dr. Jeffrey Vasiloff, M.D. - State Agency Reviewing Physician's Opinion**
**September 11, 2007**, Dr.Vasiloff, completed a physical RFC assessment (Docket No. 10, pp. 962-69, Tr.957-964). Dr. Vasiloff reviewed Plaintiff's medical records and opined that Plaintiff retained the capacity for light exertion work activities, with a ten-to-twenty pound lifting capacity, and sitting, standing and walking capacity of up to six hours total per eight hour workday (Docket No. 10, p. 963, Tr. 958).  Dr. Vasiloff limited Plaintiff to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling (Docket No. 10, p. 963, Tr. 958).  He also limited Plaintiff to occasional reaching overhead bilaterally (Docket No. 10, p. 964, Tr. 959).  Dr. Vasiloff also assessed limitations including  never climbing ladders, ropes, or scaffolds (Docket No. 10, p. 964, Tr. 959); occasionally reaching overhead with both arms (Docket No. 10, p. 965, Tr. 960); and avoiding hazards (Docket No. 10, p. 966, Tr. 961).

**Ms. Maria Kirigin - Treating Physical Therapist**
**April 24, 2008**, Plaintiff began physical therapy after continuing to experience upper extremity problems (Docket No. 10, pp. 1160-62, Tr. 1155-1157).  Ms. Kirigin, reported that Plaintiff exhibited decreased flexion to 80 degrees, abduction to 90 degrees and extension to 40 degrees, in the left upper extremity (Docket No. 10,  p. 1161, Tr. 1156).  A physical examination also revealed tenderness to palpation in area of the left mid deltoid (Docket No. 10, p. 1162, Tr. 1157). The notes support a decrease in ease with activities of daily living secondary to Plaintiff's increased left shoulder pain (Docket No. 10, p. 1162, Tr. 1157).

**July 2, 2008**, Plaintiff took physical therapy for his left shoulder, and rated his shoulder pain as three out of ten (Docket No. 10, p. 1124, Tr. 1119). Plaintiff attended two physical therapy sessions, and demonstrating improvement in all areas, including ease of flexibility, improved posture and body mechanics, and decreased pain (Docket No. 10,  p. 1110, Tr. 1105). Plaintiff was discharged having met  all of his therapy goals (Docket No. 10, p. 1111, Tr. 1106).

**May 11, 2009**, Plaintiff presented for diabetic foot care, complaining of long toe nails (Docket No. 10, p. 1337, Tr. 1332), and of right big toe pain from a toe nail growing into his skin (Tr. 1332).  Plaintiff indicated that he had not been checking his blood glucose levels because he ran out of testing strips, but stated that, generally,  his blood glucose level tended to be around 125 mg/dl (Docket No. 10, p. 1337, Tr. 1332). Plaintiff denied any tingling or burning of the  feet, and asked for new diabetic shoes (Docket No. 10, p. 1337, Tr. 1332). He stated that he had no other foot complaints (Docket No. 10, p. 1337, Tr. 1332).  Plaintiff's doctor trimmed his toe

---

[5]    The upper limit of normal for A1C is 7.

nails without incident, and ordered new shoes for him (Docket No. 10, p. 1342, Tr. 1337). His doctor recommended follow-up in three months (Docket No. 10, p. 1342, Tr. 1337).

**July 6, 2009**, progress notes showed that Plaintiff's hemoglobin A1C level had returned to normal at 6.3 (Docket No. 10, p. 1331, Tr. 1326).

**Dr. Kimberly Togliatti-Trickett, M.D.  - Examining Physician Evaluation,**
**October 13, 2009**, Dr.Togliatti-Trickett examined Plaintiff and evaluated his physical condition (Docket No. 10, pp. 1361-76, Tr. 1356-71). She stated that Plaintiff had normal (5/5) muscle strength in all of his muscle groups, and normal gripping and manipulating abilities (Docket No. 10, pp. 1361-62, Tr. 1356-57), and observed that Plaintiff walked with a normal gait, and could walk on his heels and toes (Docket No. 10, p. 1366, Tr. 1361). The examination revealed decreased range of motion in the lumbar spine, 80 degrees on flexion and 10 degrees on extension (Docket No. 10, p. 1363, Tr. 1358), decreased range of motion in the shoulders, to 20 degrees on lateral flexion bilaterally (Docket No. 10, p. 1363, Tr. 1358), and tenderness in the lumbar spine and reported Plaintiff used a lumbar back brace (Docket No. 10, p. 1366, Tr. 1361).[6]  She also opined that Plaintiff could stand and walk for at least three or four hours at a time, and had no problem sitting (Docket No. 10, p. 1367, Tr. 1362).  According to the doctor, Plaintiff could lift as much as forty pounds without difficulty (Docket No. 10, p. 1367, Tr.1362). On a separate form, Dr. Togliatti-Trickett again indicated that Plaintiff was able to lift and carry up to twenty pounds continuously and fifty pounds occasionally (Docket No. 10, p. 1371, Tr. 1366), sit up to four hours at a time and six hours a day, stand and walk three hours at a time and four hours per day (Docket No. 10, p.1372, Tr. 1367). She also noted that Plaintiff could reach overhead, handle, finger, feel, push, and pull continuously with both hands, and operate foot controls continuously with both feet (Docket No. 10, p. 1373, Tr.1368). Plaintiff was able to frequently climb stairs, ramps, ladders, and scaffolds; frequently balance and kneel; and occasionally stoop, crouch, and crawl (Docket No. 10, p. 1374, Tr. 1369).

**October 15, 2009**,  Plaintiff  underwent an MRI of the lumbar spine which showed bulging at L4-L5 (Docket No. 10, p. 1367, Tr. 1362).

### 2.  Medical Evidence: Mental

**Dr. Denise Kohler, M.D. - Reviewing Psychiatrist**
**December 7, 2004**, Dr. Kohler completed a Psychiatric Review Technique and accompanying mental RFC assessment (Docket No. 10, pp. 572-90, Tr. 567-585), reporting that Plaintiff was moderately limited in his abilities to: work in coordination or proximity to others without being distracted by them, complete a normal work week without interruption from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in work setting (Docket No. 10, pp. 572-73, Tr. 567-568).

---

[6]  At the first hearing the ALJ ordered a physical consultative exam, see reference, above.

Dr. Kohler assessed that Plaintiff had a mild restriction in activities of daily living, mild difficulties in maintaining concentration, persistence and pace, and moderate difficulties in social functioning (Docket No. 10, p. 587, Tr. 582).

**Dr. Kinberly Bogan, M.D. - Treating Physician at the VA Hospital**
**May, 2006**, Plaintiff reported that he was stable on his medication when seen at a VA outpatient psychiatric unit by a resident, Dr Bogan (Docket No. 10, p. 888, Tr. 883). He denied having any side effects from his medication, and claimed that he last heard voices one month earlier (Docket No. 10, p. 888, Tr. 883). His mental status examination revealed that his affect was pleasant, his mood was good, and he had no suicidal or homicidal thoughts (Docket No. 10, p. 888, Tr. 883).

**Dr. Joan Lederer, M.D.  - Treating Psychiatrist**
**March 16, 2007**, Dr. Lederer assessed Plaintiff's mental condition (Docket No. 10, p. 791, Tr. 786). Plaintiff told Dr. Lederer that he got sick while in the Marines and heard voices (Docket No. 10, p. 791, Tr. 786). He took Haldol and Prolixin medications for his symptoms (Docket No. 10, p. 791, Tr. 786). His condition was stable for years, and he continued to work in housekeeping at the Veterans Administration hospital until 2003, when he quit due to physical problems (Docket No. 10, p. 791, Tr. 786). Plaintiff told Dr. Lederer that he was not hearing voices or feeling paranoid at the time of the assessment (Docket No. 10, p. 791, Tr. 786). Plaintiff also told Dr. Lederer that he enjoyed getting out and looked forward to gardening (Docket No. 10, p. 791, Tr. 786). Dr. Lederer diagnosed him as a chronic paranoid schizophrenic in good control (Docket No. 10, p. 791, Tr. 786), and assigned a Global Assessment of Functioning of 50, indicating serious symptoms, trending toward moderate symptoms (Docket No. 10, p. 792, Tr. 787).[7]

**April 26, 2007**, Plaintiff told Dr. Lederer that his mood continued to be good and might have improved since he got his blood sugar under control (Docket No. 10, p. 774, Tr. 769). He said that he was not suicidal, not hearing voices, and was enjoying life (Docket No. 10, p. 774, Tr. 769). He was neatly dressed, had good hygiene, and had no signs of a formal thought disorder (Docket No. 10, p. 774, Tr. 769). His intelligence was estimated as average, and his insight and judgment were good (Docket No. 10, p. 774, Tr. 769). Dr. Lederer diagnosed Plaintiff's

---

[7]    The GAF scale reflects a "clinician's judgment" of the individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). The higher the number, the higher the level of functioning. Id. An overall GAF score is dependant on separate assessments of 1) symptom severity, and 2) social, occupational, and school functioning. Id. at 32-34. For example, a GAF score of 61-70 reflects some mild symptoms or some difficulty in social, occupational, or general functioning, but "generally functioning pretty well." Id. at 34. A GAF score of 51 to 60 reflects moderate symptoms or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. A GAF score of 41 to 50 reflects serious symptoms (eg., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

schizophrenia as under good control (Docket No. 10, p. 774, Tr. 769).

**May, 2006**, Plaintiff experienced remission with his paranoid schizophrenia and began hearing voices and sought treatment with Dr. Lederer (Docket No. 10, p. 888, Tr. 883). Dr. Lederer reported that Plaintiff heard voices the prior month, which sounded "like someone was outside talking" and that he thinks the voices are a lady asking where he was going (Docket No. 10, p. 888, Tr. 883). Dr. Lederer reaffirmed the diagnosis of paranoid schizophrenia (Docket No. 10, p. 888, Tr. 883).

**August 17, 2007**, Plaintiff told Dr. Lederer that he had more trouble sleeping as his bankruptcy proceedings were progressing (Docket No. 10, p. 1112, Tr. 1007). He was not homicidal or suicidal, but he complained of hearing vague voices and seeing shadows at night (Docket No. 10, p. 1112, Tr. 1007). Dr. Lederer described his mood and affect as sad and anxious (Docket No. 10, p. 1112, Tr. 1007). He did not appear to be internally stimulated and his judgment and insight were good (Docket No. 10, p. 1112, Tr. 1007). Dr. Lederer stated that Plaintiff was under stress with a possible increase in psychotic symptoms and referred him for day hospital treatment (Docket No. 10, p. 1112, Tr. 1007).   Dr. Lederer reported that Plaintiff returned with a flat affect, depressed mood, and fair insight and judgment (Docket No. 10, p. 1008, Tr. 1003).

**September 13, 2007**, Dr. Lederer reported that despite an increase in his paranoia medication, Plaintiff continued to hear breakthrough voices at night (Docket No. 10, p. 1039, Tr. 1034).

**December, 2007**, Dr. Lederer reported that Plaintiff continued to hear voices, but that they were faint and did not bother him (Docket No. 10, p. 1077, Tr. 1072).

**September 2008**, Plaintiff saw Dr. Lederer and told her that he was doing well (Docket No. 10, p. 1105, Tr.1100). He was not hearing voices, was not suicidal, and his affect was in the full range (Docket No. 10, p. 1105, Tr.1100). He was neatly attired, and his speech was logical, coherent, and goal-oriented without signs of a formal thought disorder (Docket No. 10, p. 1105, Tr. 1100). His schizophrenia was under good control (Docket No. 10, p. 1105, Tr.1100).

**September. 2009**, Dr. Lederer reported that Plaintiff was taking his medications regularly, and his speech was logical and coherent (Docket No. 10, p. 1385, Tr. 1380). Plaintiff was goal-oriented
without evidence of a formal thought disorder (Docket No. 10, p.1385, Tr. 1380). Dr. Lederer concluded that Plaintiff's schizophrenia was under control (Docket No. 10, p. 1385, Tr. 1380).

**Dr. Alice Chambly, M.D. - Reviewing Physician**[8]

**July 16, 2007**, Dr. Chambly, completed a Psychiatric Review Technique (Docket No. 10, pp. 948-61, Tr. 943-956). Dr. Chambly reported that Plaintiff had a mild restriction in activities of daily living, and mild difficulties in social functioning and in maintaining concentration, persistence and pace (Docket No. 10, p. 958, Tr. 953).

**Veteran's Administration Day Hospital**
**August 31, 2007**, Plaintiff began treatment at the Veterans Administration day hospital (Tr. 984,

---

[8]   In June, 2007, Plaintiff filed a new application for Disability Insurance benefits (Docket No. 10, pp. 141-43, Tr.136-138). As part of its evaluation of Plaintiff's claim, SSA had two physicians review his medical records and report their findings.

1002-03). Plaintiff reported a history of psychiatric hospitalization in the 1980s, but said he did not have any history of suicide attempts or assaults (Docket No. 10, p. 1008, Tr. 1003). Plaintiff denied suicidal or homicidal ideation (Docket No. 10, p. 1008, Tr. 1003). He said that he last heard voices one week earlier and described seeing shadows (Docket No. 10, p. 1008, Tr. 1003). His speech and behavior were appropriate (Docket No. 10, p. 1008, Tr.1003). Plaintiff participated in group therapy at the day hospital treatment program (Docket No. 10, pp. 993-94, 997-1002, Tr. 988-9, 992-97).

### C.  Hearing Testimony from February 12, 2010

#### 1.  Plaintiff's Testimony About His Physical Condition

Plaintiff testified that he stopped working at the VA Hospital in 2003 because "they put [him] on retirement disability" (Docket No. 10, p. 41, Tr. 36).   He stated that he has swelling and pain in his right arm and bilateral carpal tunnel syndrome, which flares up with activities like when he shines his shoes (Docket No. 10, p. 42, Tr. 37).  He stated that he had undergone right shoulder surgery in 2004 (Docket No. 10, p. 42, Tr. 37).  He noted that he wears bilateral wrist braces nightly  (Docket No. 10, p. 42, Tr. 37).   Plaintiff further indicated that he had neck and back pain, which caused him difficulty with both sitting and walking (Docket No. 10, pp. 43-44, Tr. 38-39). In his hearing testimony, Plaintiff identified his biggest limitations for working as involving his right arm, back, and heart conditions (Docket No. 10, p. 42, Tr. 37).

#### 2.  Plaintiff's Testimony About His Mental Condition

Regarding his mental conditions, Plaintiff stated that he hears voices and gets paranoid to the point he thinks bad things are going to happen (Docket No. 10, p. 45, Tr. 40).  He stated that to relieve these symptoms he takes his medication and lies down hoping for the episode to pass (Docket No. 10, p. 45, Tr. 40).  He testified that he experiences hallucinations such as this a few times a week, and that his symptoms are worse when he is in a crowd of

people (Docket No. 10, pp. 45, 48, Tr. 40, 43).  Plaintiff testified that he received treatment

every three months for schizophrenia, and was taking medication that helped to control his

symptoms of auditory hallucinations and paranoia (Docket No. 10, pp. 44-45, Tr. 39-40).

### 3. Vocational Expert - Kevin Zhuang Yi, M.Ed., Certified Rehabilitation Counselor

Vocational expert, Kevin Yi testified that Plaintiff had past relevant work as a

housekeeper/hospital cleaner, which was unskilled and heavy (Docket No. 10, p. 52, Tr. 47).

The ALJ posed a first hypothetical question to the VE, describing a hypothetical

individual with Plaintiff's vocational factors of age, education, and work experience, and with

the following limitations: light work that involved sitting, standing, and walking for six hours

each during an eight-hour day; lifting, carrying, pushing, or pulling ten pounds frequently and

twenty pounds occasionally; and did not involve working above shoulder level with his right

arm, which is his dominant side; with the following non-exertional limitations, no more than low

stress work that is not done in public; as well as no tasks requiring arbitration, negotiation,

confrontation, directing the work of others, or being responsible for the safety of others (Docket

No. 10, pp. 52-53, Tr. 47-48).  In response to the hypothetical he identified 1,440,000 jobs in the

national economy and 104,000 jobs in the state of Ohio economy that would accommodate such

restrictions, in the unskilled, light job categories, including small parts assembler, mail clerk, and

punch press operator (Docket No. 10, pp. 55-56, Tr. 50-51).

The VE posed a second hypothetical question, which added a limitation to sedentary

work, and the VE again identified available jobs (Docket No. 10, p. 56, Tr. 51).

Plaintiff's counsel also posed a hypothetical question to the VE, which included the

limitation of occasional use of the dominant hand for fine and gross manipulation and grasping,

to which the VE responded that all work would be precluded (Docket No. 10, p. 59. Tr. 54). The VE further testified that if Plaintiff required unanticipated breaks twice weekly, lasting 30 to 60 minutes, such a limitation would also preclude all work (Docket No. 10, p. 60. Tr. 55).

## IV. Analytical Overview: Determining Disability

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability." Colvin v. Barnhart, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Colvin, supra, (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

> **Step 1**: Determine whether the applicant is engaged in "substantial gainful activity" at the time benefits are being sought. If yes, the applicant is not disabled. If no, then move to step 2.[9]
> **Step 2**: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe." If there is no finding of a "severe" impairment, then there is no disability. If there is a determination that the applicant suffers a "severe"

---

[9] Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized. 20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b). If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

impairment, move to step 3.[10]

**Step 3**: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments. If yes, then the applicant is disabled. If no, proceed to step 4.[11]

**Step 4**: Determine if the applicant retains sufficient "residual functional capacity"[12] to allow for the performance of his past, relevant work . If the applicant possesses sufficient residual functional capacity to perform his past relevant work, then there is no disability. If not, move to step 5. [13]

**Step 5**: Determine if there are jobs in the current economy that applicant could perform, given the limits of her residual functional capacity and consistent with the applicant's other relevant characteristics. If there are such jobs, then the applicant is not disabled. If there are no such jobs, then the applicant is disabled.[14]

---

[10] Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. . 20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[11] The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1. 20 C.F.R §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

[12] A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. . 20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e). An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applicant's impairments, including those impairments that are not severe, must be considered. 20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[13] Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful activity for him. 20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[14] The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience. At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics. 20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c) .

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982););  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),. Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## V. The ALJ's Findings

**1.** Mr. Eiland last met the insured status requirements of the Social Security Act on December 31, 2009.

**2.** Mr. Eiland did not engage in substantial gainful activity during the period from his alleged onset date of November 24, 2004 through his date last insured of December 31, 2009 (20 C.F.R. § 404.1571 et seq.).

**3.** Through the date last insured, Mr. Eiland had the following severe impairments: right shoulder impingement syndrome (Docket No. 10, pp. 599-693, 694-708, Tr. 594-688, 689-703, Ex. 9F, 10F),
degenerative disc disease of the lumbar spine (Docket No. 10, pp. 709-832, 1289-1315, 1360-67, Tr. 704-827, 1284-1310, 1355-62, Ex. 11F, 27F, 30F), and schizophrenia (Docket No. 10, pp. 709-832, 833-940, 983-1023, 1024-70, 1076-77, 1078-1175, 1176-1288, 1326-59, 1377-86,  Tr. 704-827, 828-935, 978-1018, 1019-65, 1071-72, 1073-1170, 1171-1283, 1321-54, 1372-81, Ex. 11F, 12F, 19F, 20F, 24F, 25F, 26F, 29F, 33F) (20 C.F.R. § 404.1520(c)).

**4.** Through the date last insured, Mr. Eiland did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

**5.** Through the date last insured, Mr. Eiland retained the residual functional capacity to do a range of light work (20 C.F.R. § 404.1567(b)). He was further limited in that he could not work above shoulder level with his right arm, which is his dominant side. He was limited to low stress work that is not done in public. He was precluded from tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

**6.** Through the date last insured, Mr. Eiland was unable to perform any past relevant work (20 C.F.R. § 404.1565).

**7.** Mr. Eiland was born on July 24, 1959. He was 45 years old, a "younger" individual (20 C.F.R. § 404.1563) on the day his disability allegedly began. He was 50 years old, "approaching advanced age," on the date last insured.

**8.** Mr. Eiland has more than a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

**9.** Transferability of job skills is not an issue in this case because Mr. Eiland's past relevant work is unskilled (20 C.F.R. § 404.1568).

**10.** Through the date last insured, considering Mr. Eiland's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).

**11.** Mr. Eiland was not under a disability, as defined in the Social Security Act, at any time from November 24, 2004, the alleged onset date, through December 31, 2009, the date last insured (20 C.F.R. § 404.1520(g)).

(Docket No. 10, pp. 9-28, Tr. 4-23).

## VI. Standard of Review

District Court review of Commissioner of Social Security disability determinations is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards.  Colvin v. Barnhart , supra, 475 F.3d at 729.  The district court shall affirm  the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  McClanahan v. Comm'r of Soc., 474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)).  The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. Id. (citing 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir.  1992)). See also Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court

16

interference." Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Moreover, because district court review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from making credibility determinations. Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)). Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that such decision is supported by substantial evidence, even if the court were inclined to have decided the case differently. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side. Listenbee v. Sec'y of Health & Human Servs., 846 F.2d 345, 349 (6th Cir. 1988). The decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion. Smith v. Chater, 99 F.3d 780, 781-82 (6th Cir. 1996).

## VII. Issues Before the Court

This case raises two issues for review.

**Issue No. 1.** The ALJ Erred by Failing to Consider Plaintiff's Coronary Artery Disease, Diabetes and Bilateral Carpal Tunnel Syndrome as "Severe Impairments".

**Issue No. 2.** Substantial Evidence Does Not Support the ALJ's Residual Functional Capacity Assessment Which Failed to Include Any Limitations Based on Plaintiff's Bilateral Carpal Tunnel Syndrome, Left Shoulder Degenerative Joint Disease and Coronary Artery Disease.

## VIII. Discussion

**Issue No. 1: Failure to Consider Certain Impairments as Severe Impairments**

Plaintiff argues that the ALJ did not properly evaluate Plaintiff's conditions of coronary

17

artery disease, diabetes and bilateral carpal tunnel syndrome either as to their severity or as to the extent to which these conditions affected any additional limitations associated with the ALJ's residual functional capacity assessment of Plaintiff.

**A.  Definition of Severe Versus Non-Severe Impairment**

Plaintiff asserts that in the Sixth Circuit an impairment is considered to be not severe only if it is a slight abnormality with minimal effect on an individual such that it would not likely interfere with the individual's ability to work, regardless of factors like age, education, and work experience.  Bowen v. Yuckert, 482 U.S. 137, 152 (1987);  Farris v. Secretary of Health and Human Services, 773 F.2d 85 (6th Cir. 1985); Salmi v. Secretary of Health and Human Services, 774 F.2d 685 (6th Cir. 1985); Higgs v. Bowen, 880 F.2d 860 (6th Cir. 1988).  20 C.F.R. § 404.1521(a).  Ultimately, the severe impairment determination turns on "whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education and experience." Id., Farris, 773 F.2d at 89.

It is not necessarily legal error, however, where an ALJ wrongly determines the severity level of an impairment at step two of the sequential analysis, as long as the ALJ has identified at least one severe impairment and proceeds to consider all of a claimant's impairments (severe and not severe) when making the RFC assessment at steps three and four of the sequential analysis. See Maziarz v. Sec'y of Health and Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).

Consistent with the holding in Maziarz, supra, 837 F.2d at 244, the ALJ found, at step two of the sequential analysis,  that Plaintiff had three conditions that were severe impairments right shoulder impingement syndrome, degenerative disc disease of the lumbar spine, and schizophrenia (Docket No. 10, pp. 14-16, Tr. 9-11).   Thereafter, at steps three and four, the ALJ

18

evaluated Plaintiff's various conditions and impairments in his RFC assessment.[15]   As discussed,

above, the fact that the ALJ determined that some of Plaintiff's impairments were not "severe" is

not a matter of dispositive significance. See Anthony v. Astrue, 266 F. App'x 451, 457 (6th Cir.

2008) (ALJ found that claimant had severe impairments, therefore, the fact that some

impairments were not deemed to be severe at step two has no legal relevance.).

The claimant bears the burden of proof when attempting to establish that his physical or

mental impairments meet the "severe" threshold.  Yuckert, 482 U.S. at 146, n.5.[16]

In the instant case the ALJ's RFC finding determined that Plaintiff could perform a range

of light work that did not involve: working above shoulder level with his right arm, which is he

dominant side; more than low stress work that is not done in public; or tasks requiring

arbitration, negotiation, confrontation, directing the work of others, or being responsible for the

safety of others (Docket No. 10, p. 18, Tr. 13).  See, discussion of Plaintiff's Issue No. 2, infra.

**B.  Conditions**

**1.  Coronary Artery Disease**

Plaintiff argues that the ALJ failed to assess properly his coronary artery disease because

the ALJ disregarded Plaintiff's claims concerning the allegedly debilitating effects of his heart

---

[15]   After step three but before step four of the analysis, the ALJ determined Plaintiff's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4)(iv) and (e), 404.1545. The relevant DIB and SSI regulations are virtually identical.  For simplicity and convenience further citations the DIB regulations regarding disability evaluation (i.e., 20 C.F.R. § 404.1501 et seq.) will also refer to the parallel SSI regulations (i.e., 20 C.F.R. §§ 416.901 et seq.)  Note the final two digits of the DIB cites, i.e., 20 C.F.R. § 404.15xx are identical  to the final two digits of the corresponding SSI cites 20 C.F.R. § 416.9xx. (Thus, for example, the DIB 20 C.F.R. § 404.1520 is the functional equivalent of the SSI 20 C.F.R. § 416.920).

[16]   In addition, the claimant must prove that his severe impairment lasted for at least twelve months in order to prove disability.20 C.F.R. §§ 404.1509, 404.1522(b).

condition including that he suffered from chest pain, and shortness of breath on exertion (evidenced by Plaintiff having to stop in the middle of a treadmill stress test) (Docket No. 16, p.13, Docket No. 10, p. 811, Tr. 806). Plaintiff asserts that his chest pain and shortness of breath cause more than minimal limitation on his ability to work and, thus, the ALJ should rightly have regarded the coronary condition as a severe impairment.

As to Plaintiff's cardiac condition, the ALJ noted that Plaintiff's cardiac testing showed a small, mild abnormality that was consistent with reversible ischemia, and his cardiac condition was characterized as "mild" by his treating physicians (Tr. 11, Docket No. 10, pp. 805-806, 811-12, Tr. 800-01, 806-07). The record also shows that Plaintiff exercised to 8.8 METS on his stress test (which was rated as 87%) (Docket No. 10, p. 811, Tr. 806); and that his chest pain and shortness of breath resolved, with rest, within a few minutes after this occurrence (Docket No. 10, pp. 811-12, Tr. 806-07). Moreover, Plaintiff's evaluating cardiac physician Dr. Arabi Naso stated Plaintiff had "no significant impairment" when asked about Plaintiff's functional capacity (Docket No. 10, p. 811, Tr. 806). Moreover, especially relevant to the issue of what, if any, effect this condition had on Plaintiff's ability to work, Plaintiff has not established that he has any specific limitations related to his cardiac impairment that were not encompassed within the ALJ's range of light exertion finding  (Docket No. 10, p.14, Tr. 9).

### 2.  Diabetes

Plaintiff also argues that the ALJ failed to assess properly his diabetes because the ALJ disregarded Plaintiff's alleged recurrent foot problems supposedly caused by Plaintiff's diabetes, purportedly evidenced by Plaintiff requiring a prescription for special diabetic shoes (Docket No. 16, pp. 13-14, Docket No. 10, p. 1377, Tr. 1372).  Plaintiff asserts that the ALJ's determination

20

that Plaintiff can perform light work is belied by the fact that light work frequently requires a standing position and Plaintiff's allegedly diabetes caused foot problem imposed a limitation (i.e., no prolonged standing) which is inconsistent with the demands of light work (Docket No. 16, pp. 13-14).

Regarding Plaintiff's diabetes, the ALJ noted that it was first diagnosed in 2007 and, eventually, became controlled and did not result in any neuropathy, nephropathy, retinopathy, or consequences that could have work-related significance (Docket No. 10, pp. 16, 761, 1331, 1337, 1342, Tr. 11, 756, 1326, 1332, 1337).  Concerning Plaintiff's foot problems, which he contends were a result of diabetes, the record shows that Plaintiff had long toe nails and also requested new diabetic shoes in May, 2009 (Docket No. 10, p. 1337, Tr. 1332).  The record also shows that his doctor trimmed his toe nails without incident and ordered new shoes (Docket No. 10, p. 1342, Tr. 1337) and, especially relevant to Plaintiff's contention regarding the nature and severity of any diabetes related impairment is that Plaintiff, in response to his doctor's query, denied any tingling or burning in his feet, and had "no other foot complaints" (Docket No. 10, p. 1337, Tr. 1332).  It is noteworthy in the present context that Plaintiff has not alleged that a physician or other care giver has limited ability to walk due to diabetes-related foot problems. On the contrary, in October, 2009, an examining physician found that Plaintiff had normal abilities to walk for prolonged periods of time as well as operate foot controls (Docket No. 10, pp. 1366-67, 1372, 1373, Tr. 1361-62, 1367, 1368).  These assessments do not contradict the ALJ's light work finding.

### 3.  Carpal Tunnel Syndrome

Finally, Plaintiff argues that the ALJ failed to assess properly his bilateral carpal tunnel

21

syndrome (Docket No. 16, p. 14).  Plaintiff asserts that he was diagnosed with bilateral carpal

tunnel syndrome and that the diagnosis was confirmed by EMG studies as well as evidenced by

his having been prescribed wrist braces (Docket No. 16, p.14, Docket No. 10, pp. 275, 335, Tr.

270, 330).  Plaintiff asserts that the ALJ failed to assess the true severity of this condition and

also failed to incorporate it into his RFC assessment of Plaintiff (Docket No. 10, p.14, Tr. 9).

Finally, regarding Plaintiff's claim that the ALJ failed to address and weigh properly his

bilateral carpal tunnel syndrome, the June 24, 2010, Administrative Decision specifically

references Plaintiff's testimony about his carpal tunnel syndrome and that it had not been treated

with surgery, but with braces, which Plaintiff wore at night (Docket No. 10, pp. 18, 42, Tr. 13,

37).

Notwithstanding the EMG studies suggesting mild neuropathy indicative of carpal tunnel

syndrome in his right wrist (Docket No. 10, p. 275, Tr. 270), and the prescription for wrist braces

(Docket No. 10, p. 335, Tr. 330), Plaintiff has not suggested his condition warrants specific

restrictions beyond those found by the ALJ in the RFC determination.  It is also noteworthy that

the examining physician's October, 2009, evaluation did not indicate restrictions in gripping or

manipulating functions (Docket No. 10, pp. 1361-62, Tr. 1356-57), or in lifting and carrying

abilities beyond those required by light work (Docket No. 10, p. 1371, Tr. 1366).

Additionally, the ALJ specifically noted that during Plaintiff's evaluation by Dr.

Togliatti-Trickett, she found no limits on Plaintiff's abilities to handle, finger, feel, push, or pull

with both hands (Docket No. 10, p. 1373, Tr. 1368) which capabilities implicate and directly

relate to Plaintiff's carpal tunnel syndrome.  Thus, the ALJ reasonably found that Plaintiff was

capable of a light work capacity, despite his history of carpal tunnel diagnosis and treatment with

wrist braces.

For the foregoing reasons, the claim of error raised in Plaintiff's Issue No. 1 is denied.

**Issue No. 2: Residual Functional Capacity Determination, Plaintiff's Credibility, Treating Physician Opinion and Weight of Physician Opinions**

In his second issue, Plaintiff asserts that substantial evidence does not support the ALJ's RFC assessment. Specifically, Plaintiff argues that the ALJ's RFC assessment fails because it does not include reference to his carpal tunnel syndrom, left shoulder degenerative joint disease or coronary artery disease. Plaintiff also argues that substantial evidence does not support the ALJ's decision because he erred in the weight he accorded the opinion evidence of both reviewing examiner Dr. Vasiloff, treating physician Dr. Syed and treating psychiatrist Dr. Lederer.

**A. The Treating Physician Rule**

The treating physician rule imposes requirements on the manner in which the Commissioner both considers, and gives expression to, the opinions of a claimant's treating physician. First, the Commissioner shall accord treating physician opinions appropriate deference consistent with the record evidence, and, second, the decisions and determinations that the Commissioner issues must articulate, with appropriate specificity, the Commissioner's reasons for his handling of treating physician opinions.

**1. Treating Physician Opinion Accorded Deference**

20 C.F.R. § 404.1527(d)(2) provides in pertinent part,

> If we find that a treating source's opinions on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

23

Where appropriate conditions are met, a treating physician's opinions are accorded "substantial, if not controlling deference."  Vance v. SSA, 260 F. App'x 801, 804 (6th Cir. 2008), Warner v. SSA, 375 F.3d 387, 390 (6th Cir. 2004).  The most emphatic application of this rule is that, where a treating physician's opinion is uncontradicted, such opinion is entitled to complete deference. Howard v. SSA, 276 F.3d 235, 240 (6th Cir. 2002), Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).

If  the ALJ declines to place controlling weight on the treating physician opinion, the ALJ must weigh that opinion in accordance with the factors set forth in the Regulations - "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion."  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544-45 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2).

Notwithstanding the deference generally accorded treating physician opinions, the Sixth Circuit has consistently stated that "[the Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993).

The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Rogers v. Commissioner of Social Security, 486 F.3d 234, 242 (6th Cir. 2007). (citation omitted).  However, even if an ALJ finds that the

24

opinion of a treating source is not entitled to controlling weight, this does not mean the opinion should be rejected.  Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 408 (6th Cir. 2009).

It is also true, however, that a treating physician's opinions may be deficient.  See, Vance, supra, 260 F. App'x 801, 805 (physician's area of treatment differs from the medical issue about which physician opined); Gaskin v. Comm'r of Soc. Sec., 280 F. App'x 472, 474-75 (6th Cir. 2008) (physician's opinion conflicts with his treatment notes); Hamblin v. Apfel, 7 F. App'x 449, 451 (6th Cir. 2001) (treating physician's opinion was five years old).

Also, treating physician opinions are limited.  Thus, a treating physician's opinions on issues such as whether the claimant is disabled or claimant's residual functional capacity, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(e); accord Warner v. Commissioner of Social Security, 375 F.3d 387, 390 (6th Cir. 2004)  As an interpretive rule "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ will give to that opinion." 20 C.F.R. § 416.927(d)(4).

## 2.  Decisions Must Articulate, With Specificity, Rationale for Weight Accorded Treating Physician Opinions

Where a treating physician opinion is not given controlling weight the Commissioner shall "give good reasons in [the] notice of determination or decision for the weight" accorded to such opinion.  20 C.F.R. § 404.1527(d)(2).  See, Wilson v. Comm'r of Social Security, supra, 378 F.3d at 544.  When denying benefits the Commissioner's decisions shall,

> contain specific reasons for the weight given to the treating source's medical
> opinion, supported by the evidence in the case record, and must be sufficiently
> specific to make clear to any subsequent reviewers the weight the adjudicator
> gave to the treating source's medical opinion and the reasons for that weight.

25

Id., citing. Social Security Ruling 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5. See, also, Rogers v. Commissioner of Social Security, supra,  486 F.3d at 242.

Because the reason-giving requirement exists to ensure] that each denied claimant receives fair process the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  Rogers, supra, 486 F.3d 234, 243.  See also Blakley v. Comm'r of Soc. Sec., 581 F.3d 399 (6th Cir. 2009) (Sixth Circuit reversed decision of District Court upholding ALJ decision of nondisability and remanded to the Commissioner).   An ALJ's failure to go through the required analysis and comprehensively set forth the reasons for the weight assigned to a treating physician's opinion constitutes a lack of substantial evidence and necessitates remand, even where the conclusion may be justified by the record. Blakley, supra, 581 F.3d at 407; Hensley v. Astrue, 573 F.3d 263, 267 (6th Cir. 2009) (quoting Wilson, 378 F.3d at 545).

   **B.  Credibility**

In performing his RFC analysis, the ALJ also considered Plaintiff's subjective complaints and determined that they were not wholly credible.

As a general rule the district court shall defer to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). It is not within the range of authority of the reviewing court to ". . . try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." Walters v.Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997).

In the instant case the ALJ stated that he had considered Plaintiff's subjective complaints in accordance with the requirements of Social Security Ruling 96-7p[17] and 20 C.F.R. § 404.1529 (Docket No. 10, p. 18, Tr. 13), and identified the several factors that he had weighed in making his credibility assessment, including specific citations to medical records and medical source opinions, objective clinical findings, treatment regimen, medication use, and activities (Docket No. 10, pp. 18-21, Tr. 13-16).  There was an adequate degree of detail in the ALJ's assessment to support his conclusions regarding Plaintiff's credibility. See 20 C.F.R. § 404.1529(c)(3)(i).

Viewing the whole of the record and informed by his assessment of Plaintiff's credibility, the ALJ reasonably concluded that Plaintiff's impairments caused limitations to a reduced range of light work (Docket No. 10, pp. 18-21, Tr. 13-16). As such, the record provides substantial evidence to support the ALJ's decision that Plaintiff was not disabled.  See Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) ("[T]here is a 'zone of choice' within which the Commissioner can act, without the fear of court interference.").(citations omitted)

**C.  Evidence**

**1.  Dr. Vasiloff**

Concerning the opinion of state agency reviewing physician Dr. Vasiloff, Plaintiff asserts that the ALJ improperly rejected his opinion that Plaintiff was  limited to occasional balancing, stooping, kneeling, crouching, crawling and reaching overhead bilaterally (Docket No. 16, pp. 15-16, Docket No. 10, pp. 963-65, Tr. 958-60).  Plaintiff also states that the ALJ disregarded Dr. Vasiloff's views regarding Plaintiff's carpal tunnel syndrome even though Dr. Vasiloff's opinion

---

[17]   Social Security Ruling 96-7p, Policy Interpretation Ruling, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statement, 61 Fed.Reg. 34483 (July 2, 1996).

was consistent with the opinion of Dr. Syed, one of Plaintiff's treating physicians (Docket No.16, p. 16).

As to Plaintiff's contentions that the ALJ disregarded Dr. Vasiloff's opinions concerning Plaintiff's carpal tunnel syndrome, Plaintiff's claim of error is unpersuasive since the record does not indicate that Dr. Vasiloff ever considered Plaintiff's carpal tunnel condition when making his medical assessment of Plaintiff (Docket No. 10, pp. 963-64, Tr. 958-59).

Concerning the limitations that Dr. Vasiloff did consider, (e.g., balancing, stooping, kneeling, etc.), he did not identify limitations that exceeded the ALJ's finding that Plaintiff had the capacity for light work (Docket No. 10, p. 963, 965, Tr. 958, 960).   Additionally, regarding Plaintiff's carpal tunnel syndrome, the ALJ did consider the October, 2009 examination opinion of Dr. Togliatti-Trickett, who found no limits on Plaintiff's abilities to handle, finger, feel, push, or pull with both hands (Docket No. 10, p. 1373, Tr. 1368), all of which conditions implicate and are reasonably related to Plaintiff's carpal tunnel syndrome and have reflected it in the opinion of Dr. Togliatti-Trickett.  Accordingly, it was not unreasonable for the ALJ to have given more weight to Dr. Togliatti-Trickett's opinion regarding this condition.

### 2. Dr. Syed

Regarding Dr. Syed, Plaintiff notes that in 2002, Dr. Syed limited Plaintiff to handling with his dominant hand for 1 hour at a time, up to 4 hours daily (i.e. occasionally) (Docket No. 10, p. 1287, Tr. 1282, Docket No. 16, p. 16).  Plaintiff argues that the fact that this opinion was formed prior to Plaintiff's onset date[18] is not relevant since by the end of the year following the year that Dr. Syed uttered this opinion Plaintiff's condition had deteriorated to the point that he

---

[18] Plaintiff alleged a disability onset date of November 24, 2004.

28

could no longer work (Docket No. 16, p. 16).  Plaintiff also argues that the ALJ was further required to articulate, with specificity, his rationale for disregarding Dr. Syed's opinion and by failing to do that his disability determination was not based on substantial evidence. Id.  See, Rogers, supra,  486 F.3d at 247; White v. Commissioner of Social Sec., 312 Fed. Appx. 779, 286 (6th Cir., 2009) (insufficient reasons require reversal).

Plaintiff's argument regarding the value of Dr. Syed's opinion is problematic as the report to which Plaintiff refers in support of his argument did not set forth Dr. Syed's opinion but, rather, Plaintiff's own "client estimated functional tolerances," and, thus,  was not Dr. Syed's professional medical opinion regarding work limitations that he assigned to for Plaintiff (Docket No. 10, p. 1287, Tr. 1282).   Interestingly, Dr. Syed's 2002 report states that Plaintiff was working without restrictions at that time (Docket No. 10, p. 1287, Tr. 1282).

Additionally, Plaintiff's argument concerning the irrelevance of the 2002 date of the report is a bit misplaced considering that a January, 2004, report also by Dr. Syed states that Plaintiff continued to work full-time, notwithstanding certain restrictions (Docket No. 10, p. 629, Tr. 624), and in spite of the fact that his conditions were, arguably, worsening and, ultimately, lead to his disability.  In this regard Dr. Syed's medical findings in November, 2003 and January, 2004 (almost a year before his claimed disability onset date) were normal and did not suggest an inability to work (Docket No. 10, pp. 532, 625, 629-30, 633, Tr. 527, 620, 624-25, 628).

Finally, Plaintiff has not identified any  evidence from Dr. Syed showing that his condition had a worsened after November, 2004 that might suggest disability during the relevant period at issue.  For these reasons Plaintiff has not established that the 2002 evidence from Dr. Syed regarding Plaintiff's functional limitations deserve any greater weight than that assigned by the ALJ.

### 3.  Dr. Lederer

Finally, Plaintiff argues that the ALJ erred in his assessment of the opinion of treating

psychiatrist, Dr. Lederer.   Specifically, Plaintiff draws the Court's attention to page 4 of the

ALJ's decision where the ALJ observes that Dr. Lederer  assigned Plaintiff a GAF score of 50

which the ALJ characterized as " indicating serious <u>tending toward moderate</u> symptoms"

(Docket No. 10, p. 15, Tr. 10) (emphasis added).  Concerning the ALJ's interpretation of this

GAF score Plaintiff asserts "[o]n the GAF scale, a rating of 41 to 50 indicates serious (not

moderate) symptoms or a serious (not moderate) impairment in occupational functioning."

(Docket No. 16, p. 17).  Plaintiff argues that there is an inconsistency in the ALJ having ascribed

great weight to Dr. Lederer's opinion while also interpreting (or, from Plaintiff's perspective,

misinterpreting) Plaintiff's GAF score of 50 as being serious but "tending toward moderate"

such that it renders the ALJ's decision faulty.

The DSM-IV-TR explains, the higher the GAF number, the higher the level of

functioning.  See <u>American Psychiatric Association, Diagnostic & Statistical Manual of Mental</u>

<u>Disorders,</u> 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR").

An overall GAF score is dependant on separate assessments of 1) symptom severity, and

2) social, occupational, and school functioning. <u>Id</u>. at 32-34. For example, a GAF score of 61-70

reflects some mild symptoms or some difficulty in social, occupational, or school functioning,

but "generally functioning pretty well." <u>Id</u>. at 34. A GAF score of 51 to 60 reflects moderate

symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends,

conflicts with peers or co-workers). <u>Id</u>. A GAF score of 41 to 50 reflects serious symptoms

(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious

impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Id.

As discussed, Dr. Lederer determined that Plaintiff had a GAF score of 50, which is in the upper end of the serious range (Docket No. 10, p. 792, Tr. 787). That the ALJ characterized the Plaintiff's GAF score as "serious but trending toward moderate" (Docket No. 10, p. 15, Tr. 10), is not inconsistent with the general categorical structure established in the GAF scoring system. Clearly a GAF of 41 tells a different story than might be told by a GAF of 50 even though both scores fall in the general range of serious functional impairment. Moreover, the functional capabilities of a person with a GAF score of 50 are closer to the functional capabilities of a person with a GAF of 51 than they are to the functional capabilities of a person with a GAF of 41, despite the fact that the GAF scores of 50 and 51 inhabit ostensibly different qualitative levels. Thus, this Court does not regard the "serious but trending toward moderate" characterization of the meaning of Plaintiff's GAF score of 50 as misrepresenting the meaning of the GAF score as a mechanism designed to reveal Plaintiff's real world functionality.

As Plaintiff noted (see, Docket No. 16, p. 17) the Sixth Circuit has recognized that "a [GAF] score may have little or no bearing on the subject's social and occupational functioning...[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place." Kornecky v. Comm'r of Soc. Sec., No. 04-2171, 2006 WL 305648, at *13-14 (6th Cir. Feb. 9, 2006). Clearly, this assessment of the significance of the GAF score as a tool for evaluating a claimant's ability to function in an occupational setting can cut both ways. Additionally, the view articulated by the Sixth Circuit implicitly acknowledges that the qualitative category designations of the GAF scoring system are not necessarily intended for rigid application and may permit interpretation with a modicum of flexibility, at least at the margins of those categories.

Whether or not this argument, as set forth under Plaintiff's Issue No. 2, constitutes a discreet challenge to the ALJ's RFC assessment may be a matter of interpretation.[19]   Regardless, a review of the medical record of Dr. Lederer shows that Plaintiff's schizophrenia has been well-controlled with medications, has been stable for years, was not the basis for him quitting work and did not cause suicidal or homicidal thoughts (see e.g., Docket No. 10, pp. 774, 791, 888, 1008, 1105, 1385, Tr. 769, 786, 883, 1003, 1100, 1380).  Thus,  the ALJ's characterization of the severity of Plaintiff's mental impairment was reasonable.

### 4. Drs. Syed and Vasiloff and the Upper Extremity Issue

Finally, Plaintiff argues that despite both Drs. Syed and Vasiloff having provided evidence that Plaintiff is limited to occasional use of his upper extremities, the ALJ found that Plaintiff was only limited in the use of his right upper extremity for activities above shoulder level.   Plaintiff argues that the ALJ's finding fails to accommodate appropriately Plaintiff's problems with his left upper extremity, as well as problems with fine and gross manipulation and other activities performed below shoulder level, including reaching (Docket No. 16, p. 17).[20]

As discussed , above, Dr. Syed did not make an independent, professional, medical assessment of the restrictions of Plaintiff's upper extremities.  The record shows only that he reported Plaintiff's personal assessment of his own tolerances and capabilities regarding what he could handle with his right hand (Docket No. 10, p. 1287, Tr. 1282).  As well, Dr. Vasiloff

---

[19]    Defendant has asserted that Plaintiff has not contested the ALJ's mental functional capacity finding and, thus, according to Defendant, Plaintiff has waived the issue (Docket No. 19, p. 10).

[20]    Plaintiff states that had the ALJ not erred in his interpretation of the evidence provided by Drs. Syed and Vasiloff regarding Plaintiff's left upper extremity limitations the hearing testimony of VE Li, responding to the hypothetical limiting Plaintiff to occasional use of his dominant hand for fine and gross manipulation, would have precluded all work.

opined that Plaintiff was only occasionally limited in reaching overhead with both arms (Docket No. 10, p. 966, Tr. 961).  As to this assessment, the ALJ determined that it was not entitled to much weight because it did not comport with Plaintiff's June, 2008 treatment records, which showed that his symptoms resolved after a short course of physical therapy (Docket No. 10, pp. 1110-1111, 1124, Tr. 1105-06, 1119).

Additionally, Dr. Togliatti-Trickett's evaluation of October, 2009 differs from Dr. Vasiloff's findings, noting that Plaintiff could reach overhead continuously with both hands (Docket No. 10, p. 1373, Tr. 1368).  As the ALJ stated, he gave Dr. Togliatti-Trickett's opinion "substantial weight" when assessing Plaintiff's residual functional capacity and the credibility of Plaintiff's symptoms and complaints of pain (Tr. 14).

At step four of the sequential analysis the ALJ determined that Plaintiff was unable to perform his past relevant work (Tr. 16).  Accordingly, the burden shifted to the Commissioner to show there were other jobs existing in significant numbers in the economy that Plaintiff could perform, consistent with his RFC  and vocational factors of age, education, and work experience (Tr. 16-17). 20 C.F.R. § 404.1560(b)(3); Cole v. Sec'y of Health & Human Servs., 820 F.2d 768, 771 (6th Cir. 1987).

Defendant asserts that the ALJ, when formulating his RFC,  reasonably and correctly credited only those restrictions supported by the record as a whole, when formulating his RFC and rejected those claimed restrictions that were based on Plaintiff's unsupported allegations (Docket No. 10, pp. 58-60, Tr. 53-55).  Defendant argues that Plaintiff has not established that any claimed additional restrictions on reaching, manipulation, or need for extra breaks were warranted, and the ALJ was not bound by testimony showing such conditions were disabling. See Stanley v. Sec'y of Health & Human Servs., 39 F.3d 115, 118 (6th Cir. 1994).

33

Here the ALJ reasonably determined that there were jobs in the economy that Plaintiff was capable of doing by posing a properly structured hypothetical question to a qualified VE. The vocational expert considered job possibilities in the national economy, for an individual with Plaintiff's vocational factors of age, education, and work experience, with the following limitations: light work that involved sitting, standing, and walking for six hours each during an eight-hour day; lifting, carrying, pushing, or pulling ten pounds frequently and twenty pounds occasionally; and did not involve working above shoulder level with his right arm, which is his dominant side; no more than low stress work that is not done in public; or tasks requiring arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others (Docket No. 10, pp. 52-53, Tr. 47-48).  In this case, the ALJ reasonably assessed Plaintiff's medical records and constructed a reasonable hypothetical question that accurately tracked Plaintiff's various functional limitation.   See Smith v. Halter, 307 F.3d 377, 378 (6th Cir. 2001) ("A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments.").

For the foregoing reasons the claim of error raised in Plaintiff's Issue No. 2 is denied.

## IX. Conclusion

For these reasons, the Magistrate Orders that Commissioner's Decision is Affirmed.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   May 25, 2012